**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **RHONDA CAIN** | : | |
| PO Box 28714 | | CASE NO. |
| Columbus, Ohio 43228 | : | |
| | | JUDGE: |
| Plaintiff, | : | |
| | | **JURY DEMAND ENDORSED HEREON** |
| vs. | : | |
| | : | |
| **BIRGE & HELD PROPERTY** | | |
| **MANAGEMENT, L.L.C.,** | : | |
| 8902 N Meridian Street, Suite 205 | | |
| Indianapolis, IN 46260 | : | |
| Defendants. | : | |

## COMPLAINT

Now comes the Plaintiff, Rhonda Cain, and for her Complaint, states as follows:

## PARTIES

1.      Plaintiff is domiciled in and a citizen of the State of Ohio.

2.      Defendant Birge & Held Property Management LLC, ("B&H") is a business entity

organized and existing under the laws of Indiana, with its principal place of business in Indianapolis,

Indiana, doing business in the State of Ohio.

## JURISDICTION AND VENUE

3.      This Court has diversity jurisdiction under 28 U.S.C. § 1332.

4.      This Court has personal jurisdiction over the Defendant.

5.      Venue is proper under S.D. Ohio Local Rule 82.1.

## FIRST CAUSE OF ACTION: BIRGE & HELD CONTRACTUAL VIOLATIONS

6.      At all times relevant herein, Hidden Creek Apartments dba/aka AndMark Hidden Creek Apartments LLC ("Hidden Creek") was the owner of the residential apartment complex located at 4800 Hall Rd, Columbus Ohio 43228.

7.      Hidden Creek partnered with independent contractor B&H through an express contract that Hidden Creek and B&H admitted required B&H to assume the duty owed to tenants and guests and be jointly responsible for the operation, maintenance, management, possession, inspection, safety, security, and control of the premises including "repair and maintenance" of the common area stairway systems at 4800 Hall Rd, Columbus Ohio 43228 with the express intent that tenants and guests would benefit from the contract, incorporated as if fully rewritten herein.[1]

8.      At all times relevant herein, B&H was required, "To repair and maintain the Project in a neat and first-class manner" and "employ reputable lawyers" and "engineers" "in Operating the Project" upon which the "Manager shall have in its employ at all times a sufficient number of capable employees or subcontractors to enable it to properly, adequately, safely, and economically, manage, operate, and maintain the Project" in behalf of tenants and guests and remains responsible for injuries and/or damages sustained by the Plaintiff for their negligence and failure to adhere to the mandatory requirements of the B&H contract, incorporated as if fully rewritten herein.[2]

9.      The common areas were in the exclusive control of the owner and Defendant pursuant to the Lease and Property Management contracts.

10.      At all relevant times, Plaintiff Rhonda Cain was a business invitee and guest on the Hidden Creek apartment property for purposes of picking up her sister for work, Pamela White, a

---

[1] Ex. 1, Defendant Birge & Held Management Agreement with AndMark Hidden Creek.
[2] Ex. 1, Defendant Birge & Held Management Agreement with AndMark Hidden Creek.

tenant and renting an apartment located at 4800 Hall Rd, Columbus Ohio 43228 on the second floor, Apartment No. 1004.[3]

11.     On August 31, 2021, at approximately 9:00pm Plaintiff ascended the wooden exterior steps exposed to the weather that was the only means of ingress/egress to Ms. White's apartment at 4800 Hall Rd Columbus Ohio 43228, #1004.

12.     The common area exterior stairway was divided into two sections separated by a landing but with no risers nor graspable handrails on either side of the steps. The steps were dimly lit by lighting from other apartments exterior front door lights and the parking lot as the stairway landing light was broken, hanging by a wire, and had been broken for at least 8 months prior to August 31, 2021.

13.     Plaintiff Rhonda Cain attempted to descend the same wooden stairs on August 31, 2021, at approximately 10:00 p.m. at the Hidden Creek property at which time a wooden step on the lower section of the stairs broke in half, gave way, and otherwise failed causing Plaintiff to fall hitting her body and head on the steps and concrete sidewalk below causing the Plaintiff to suffer permanent physical injuries including multiple fractures of her left hip that required and continues to require medical care.

14.     B&H implemented Standard Operating Procedures that included mandatory daily inspections of the common areas that were not accomplished by capable employees, lawyers, engineers, or subcontractors as no such individuals were retained.

15.     On August 31, 2021, the Defendant, through their agents, servants, partners, and assigns breached their duty of care which an ordinarily careful and prudent person would exercise under the same or similar circumstances owed Plaintiff upon which she relied by failing to provide

---

[3] Ex. 2, Lease Agreement of Pamela White.

safe common areas as required by contract where it assumed duties set forth in the contract including Ohio Revised Code Chapter 5321.04 and the Columbus, Ohio Building Code.

16. B&H failed to provide the tenants and business invitees/guests including the Plaintiff with safe, fit, and habitable common area exterior wooden stairway that had visible signs of deterioration that included worn, rotten, split, moldy, and insect infested wooden steps B&H employee Chris Beatty noted after the fall.

17. B&H failed to skillfully inspect, repair, or maintain the stair steps to preserve the stairs from failure or decline resulting in Plaintiff's fall, losses, and damages.

18. As a direct and proximate result of the Defendant's breach, acts, and omissions, Plaintiff sustained injury to her person requiring medical treatment and incurred medical expenses in the past, and she will continue to require medical treatment and incur medical expenses into the future.

19. As a direct and proximate result of the Defendant's breach, acts, and omissions, Plaintiff has suffered mental anguish, pain and suffering, and emotional distress, and will continue to suffer mental anguish, pain and suffering, and emotional distress into the future.

20. As a direct and proximate result of the Defendant's breach, acts, and omissions, Plaintiff has incurred lost wages, income, and undetermined miscellaneous expenses and expects to incur lost wages and miscellaneous expenses into the future.

21. As a direct and proximate result of the Defendant's breach, acts, and omissions, Plaintiff's earning capacity has been permanently impaired.

**SECOND CAUSE OF ACTION: DEFENDANT'S NEGLIGENCE/MALICE**

22. Plaintiff incorporates by reference all the foregoing allegations and paragraphs as if fully rewritten herein.

23.     Defendant B&H individually and collectively through its agents, contractual partners, and assigns negligently and/or maliciously breached their duty of care owed Plaintiff by:

(a)     failing to inspect, repair, or maintain the dangerous or defective steps at 4800 Hall Rd Columbus Ohio 43228 at any time during B&H's assumed duty to comply;

(b)     failing to warn the Plaintiff and other business invitees of the dangerous conditions created from the dangerous or defective steps at 4800 Hall Rd Columbus Ohio 43228 at any time during B&H's assumed duty to comply;

(c)     failing to protect Plaintiff and other business invitees by inspecting, maintaining, or doing other affirmative acts which would have removed the dangerous conditions including the defective steps at 4800 Hall Rd Columbus Ohio 43228 at any time during B&H's assumed duty to comply;

(d)     failing to retain, supervise and/or train its employees in the proper and safe maintenance of dangerous or defective common areas at 4800 Hall Rd Columbus Ohio 43228 through retained reputable lawyers and engineers in Operating the Project upon which the Manager was required to have in its employ at all times a sufficient number of capable employees or subcontractors to enable it to properly, adequately, safely, and economically, manage, operate, and maintain the Project at any time during B&H's assumed duty to comply;

(e)     failing to provide reasonably safe steps with graspable handrails in the common area for tenants and business invitees/guests at 4800 Hall Rd Columbus Ohio 43228, contrary to applicable safety statutes, ordinances, regulations, and the Ohio Building Code at any time during B&H's assumed duty to comply; and

(f)     failing to remove, remedy, or maintain the dangerous or defective steps and handrails at 4800 Hall Rd Columbus Ohio 43228 at any time during B&H's assumed duty to comply;

## THIRD CAUSE OF ACTION: LANDLORD AND TENANT STATUTORY VIOLATIONS-BIRGE & HELD

24.     Plaintiff incorporates by reference all the foregoing allegations and paragraphs as if fully rewritten herein.

25.     Hidden Creek through its attorney Steven Chang, 200 Civic Center Dr., Suite 800

5

Columbus, OH 43215 has represented Birge & Held was responsible for the safety and security of its tenants and guests and identified the persons by name all of which were at all times employed by Defendant Birge & Held but none of which were Hidden Creek employees, reputable lawyers, engineers, capable employees, or subcontractors to properly, adequately, safely, and economically, manage, operate, and maintain the property.

26. Defendant's failure to provide the premises in a fit, habitable, and safe condition, among other things referred to herein, was negligence per se, is a violation of Ohio Revised Code Chapter 5321.04, and other statutes, ordinances, building, housing, health, safety, and Ohio Building Codes.

27. As a direct and proximate result of the statutory violation of the Defendant, Plaintiff was injured and damaged as set forth above.

**WHEREFORE,** Plaintiff Rhonda Cain respectfully demands the following:

(A) Judgment against and Defendant Birge & Held as to the First Cause of Action for compensatory and consequential damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), and all other remedies available at law or in equity;

(B) Judgment against Defendant Birge & Held as to Second Cause of Action for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00) and all other remedies available at law or in equity;

(C) Judgment against Defendant Birge & Held as to Third Cause of Action for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00) and all other remedies available at law or in equity;

(D)     Interest, attorney's fees, punitive damages, the costs of this action; and

(E)     Any other relief in law or equity the court deems appropriate.

Respectfully submitted,

*/s/ Scott E. Smith*
Scott E. Smith (0003749)
Trial Counsel
**Scott Elliot Smith, L.P.A.**
5003 Horizons Drive, Suite 101
Columbus, OH 43220
Telephone:     (614) 846-1700
Facsimile:     (614) 486-4987
Email:         ses@sestriallaw.com
*Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

The undersigned Attorney for Plaintiff hereby demands a trial by jury on any and all triable

issues, such demand being made pursuant to Rule 38 of the Federal Rules of Civil Procedure.

*/s/ Scott E. Smith*
Scott E. Smith (#0003749)

7



BIRGE&HELD

## MANAGEMENT AND ACCOUNTING SERVICES AGREEMENT

THIS MANAGEMENT AND ACCOUNTING SERVICES AGREEMENT (the "Management Agreement") effective as of the 1st day of August , 2021 (the "Effective Date"), by and between AndMark Hidden Creek Apartments, LLC ("Owner") and BIRGE & HELD PROPERTY MANAGEMENT, LLC, an Indiana limited liability company ("Manager");

### WITNESSETH:

WHEREAS, the following facts are true:

A.     Owner is the owner of certain real estate upon which residential buildings have been constructed at 4800 Hall Road, Columbus OH 43228 more commonly known as Hidden Creek Apartments (the "Project").

B.     Owner wishes to employ Manager to manage the Project in accordance with the terms of this Management Agreement and Manager desires to assume such duties upon the terms and condition set forth in this Management Agreement.

NOW, THEREFORE, it is agreed as follows:

1.     Employment of Manager. Owner hereby employs Manager to manage and operate the Project subject to and upon the terms and conditions set forth in this Management Agreement. Manager agrees to accept such employment and to manage and maintain the Project consistent with the standards of management utilized by Manager in managing other properties in the State of Indiana, subject to and upon the terms and conditions set forth in this Management Agreement. Manager, acting at all times in good faith, agrees to make available to Owner the full benefit of its experience and judgment.

2.     Term. This Management Agreement shall become effective and all authority, duties, responsibilities and compensation hereunder shall be deemed to have commenced as of the date of this Management Agreement and shall continue for one (1) year or until the Project is sold to an independent third party in an arm's length transaction (to include a foreclosure or deed in lieu of foreclosure) (a "Project Sale"), whichever occurs first. Owner or Manager may terminate this Management Agreement at any time, and for any reason, upon thirty (30) days' written notice to the other party, or by Owner contemporaneously with the closing of a Project Sale (provided, Owner shall endeavor to provide thirty (30) days' prior written notice of such closing being scheduled). If neither party terminates within thirty (30) days of contract expiration, this Management Agreement will automatically be extended on a year to year basis (subject to the sixty

I\15788233.3
CONFIDENTIAL

1

AndMark_000098

# EXHIBIT 1

(60) day termination notice by either party, and Owner's termination right in connection with a Project Sale, both as described above).

      3.   <u>Duties of Manager</u>. The duties of Manager to be performed in the management and operation of the Project include the following:

(a)    To negotiate leases for the Project for and on behalf of Owner and use its best efforts on behalf of Owner to maintain high occupancy so that the Project may be operated profitably. The terms and provisions of all leases shall be subject to the approval of Owner.

(b)    From time to time, Manager may propose advertising plans outside the scope of the approved budget which Manager deems to be in the best interests of the Project and in furtherance of promoting the Project and maintaining high occupancy thereof, to Owner for Owner's approval (which Owner may grant or withhold in its sole discretion). Any such approved plans will be at Owner's expense.

(c)    To use its best efforts to collect all rents and other sums due Owner in the ordinary course of business, to employ such qualified and reputable lawyers and accountants and other professional persons as may be necessary and to proceed in the name of Owner against any person, firm, or corporation indebted to the Owner for rentals or otherwise.

(d)    To maintain a separate bank account for the benefit of Owner (the "Trust Account") in which all receipts from the Project will be deposited and from which all payments with respect to the Project will be made. Manager shall inform such bank in writing that the funds deposited in the Trust Account are held in trust for Owner. Manager shall not deposit funds attributable to any other property into the Trust Account. Manager shall pay all mortgage payments required and other authorized items of costs or expense. From time to time, at the direction of Owner, if funds are available, Manager shall distribute amounts to Owner.

(e)    To pay all taxes and insurance premiums when due to the extent that funds are available and to promptly notify Owner if additional funds are required.

(f)    To repair and maintain the Project in a neat and first-class manner. For any item of repair or replacement not budgeted costing in excess of Five Thousand Dollars ($5,000.00) (except for emergencies, in which case, Manager may make repairs in excess of the aforementioned amount), such expenditure must be specifically authorized in advance in writing by Owner.

(g)    To employ such professional services, including qualified and reputable lawyers, accountants, surveyors, and engineers, on behalf of Owner as may be required in the ordinary course of the business of operating the Project (which shall expressly exclude any professional services involving a sum of more than Two Thousand – Five Hundred Dollars ($2,500.00) or as authorized in writing by Owner.

(h)     To prepare an annual budget of expenses to be incurred in the promotion, operation, repair, and maintenance of the Project and to deliver the same to Owner for its approval as soon as reasonably practicable after the Effective Date. At Owner's request, Manager shall modify the format and information and expenses to be included in the annual budget from time to time, and shall deliver updated budgets reflecting actual expenditures vs. budgeted expenditures upon Owner's request.

It is understood by Owner that nothing contained in this Management Agreement shall in any way require Manager to advance funds in payment of any costs or expenses incurred in connection with the Project, it being understood that all such expenses are the obligation of Owner unless specifically and expressly allocated to Manager or excluded from Owner's responsibility in this Management Agreement. In the event and to the extent that there are not sufficient operating funds in the Trust Account to meet budgeted expenses, Manager shall immediately notify Owner in writing and Owner will promptly fund any deficit; however, if, for any reason, Manager does make such advances, Manager shall be promptly reimbursed by Owner.

Unless otherwise approved by Owner the following expenses or costs incurred by or on behalf of Manager in connection with the management and leasing of the Project shall be at the sole cost and expense of Manager and shall not be reimbursed by Owner:

- Salaries, other compensation and other employee benefits for personnel in Manager's home office, including credit and collections personnel, bookkeeping and accounting personnel, secretaries and management personnel;

- General accounting and reporting services which are within the scope of Manager's responsibility to Owner;

- Cost of forms, papers, ledgers, and other supplies and equipment used in Manager's office at any location off the Project and not utilized for the benefit of the Project;

- Cost of electronic data processing equipment, or any pro rata charge thereon, if located at Manager's office off the Project;

- Cost of travel by Manager's employees or agents to and from the Project;

- Cost of comprehensive crime insurance or fidelity bond purchased by Manager for its own account

- Cost of insurance (including, without limitation, premiums and deductibles and/or self-insured retentions) required to be carried by Manager pursuant to this Management Agreement; and

- All overhead and general expenses attributable to Manager's regional and corporate office or offices.

4.    Relevant Documents. Promptly upon execution of this Management Agreement, Owner shall deliver or make available to (e.g. via electronic distribution or shared file access) Manager all of the relevant, non-proprietary documents in Owner's possession in connection with the Project with any information contained therein deemed confidential by Owner redacted. These include, but are not limited to, all leases, current accounting for rents collected, Owner's title insurance policy, and the like with respect to the Project, all insurance policies procured by Owner with respect to the Project, a copy of any mortgage and other evidence of indebtedness with respect to the Project required to calculate or verify payments on debt service to be made by Manager pursuant to this Management Agreement.

5.    Owner's Insurance. Owner will procure, and Manager shall maintain on behalf of Owner, at Owner's expense, adequate insurance against physical damage, with fire and extended coverage endorsement and against liability for loss, damage, or injury to property or persons which might arise out of the occupancy, management, operation, or maintenance of the Project. Manager shall do what is necessary to have Manager and landlord under the leases named as an additional insured. Manager will notify Owner in the event such insurance is not in full force and effect.

6.    Approval of Leases and Contracts Except to the Extent Provided in the Budget. All contracts executed in connection with the Project (except contracts involving a sum less than Five Thousand Dollars ($5,000.00) or otherwise designated in the budget not entered into with an affiliate of Manager) shall be submitted to Owner for approval. The form of leases used will be approved by Owner. All rental rates will be approved by Owner.

7.    Accounting Records. In addition to those services detailed above in Section 3, Manager will maintain books and records of account for the Project in its offices in Marion County, Indiana, which shall be open to the inspection of Owner at all reasonable business hours. The books and records will be kept in accordance with generally accepted accounting principles. Within fifteen (15) days after each calendar month, Manager will provide a detailed financial report to Owner covering the prior month. Within sixty (60) days following the end of each calendar year, Manager will deliver to Owner a detailed financial statement covering the profit and loss derived from the Project prepared in accordance with generally accepted accounting principles.

8.    Owner's Right to Audit. Owner reserves the right (through Owner's employees or others appointed by Owner) to conduct examinations, without notification, of the books and records maintained for Owner or otherwise with respect to the Project by Manager. Should Owner discover either weaknesses in internal control or errors in record keeping, Manager shall promptly correct such discrepancies and issues. Any and all such audits conducted by Owner will be at the sole expense of Owner, provided Manager shall be liable for any short-fall discovered in the course of the audit. Notwithstanding the foregoing, if Owner's audit determines that Manager has failed to correct weaknesses in internal control or errors in record keeping previously identified to Manager, then Manager shall promptly reimburse Owner for the full out of pocket cost actually incurred by Owner connection with such audit in addition to paying to Owner the amount of any short-fall discovered in the course of the audit.

9.    Final Accounting. Upon termination of this Management Agreement for any reason, Manager shall deliver to Owner the following with respect to the Project:

(a)    A final accounting reflecting the balance of income and expenses on the Project as of the date of termination, to be delivered to Owner within thirty (30) days after termination.

(b)    Any balance of monies of Owner or tenant security deposits, or both, held by Manager with respect to the Project, shall be delivered immediately upon termination.

(c)    All books and records, contracts, drawings, plans, keys, supplies, receipts for deposits, unpaid bills, inventory, and data for information related to the Project in Manager's possession or control, and other papers or documents which pertain to the Project, shall be delivered to Owner immediately upon termination.

Manager further agrees to do all other things reasonably necessary for a period of thirty (30) days after termination of this Management Agreement and work with the party designated by Owner to cause an orderly transition of the management of the Project.

10.    General Fees and Expenses.

(a)    Throughout the Term hereof, as compensation for services rendered hereunder, Manager will be paid a monthly fee in the amount of 3% of the Income from the Project actually collected and remitted during the month, but in no case shall the fee be less than Four Thousand Five Hundred Dollars per month ($_____). The term "Income", for the purposes of computing the general management fee, means all rent and other income, including laundry income, from the Project except and excluding: (1) security deposits (except if such deposits are applied as rental income upon termination of a lease); (2) rents paid more than thirty (30) days in advance of the due date until the month in which such payments are to apply as rental income; (3) monies collected for capital items which are paid for by tenants; (4) insurance proceeds (other than rental interruption insurance or proceeds) and condemnation awards; (5) any funds furnished by Owner, including, without limitation, any capital expenditures or funds deposited to cover costs of operations made by Owner; (6) any refunds or abatements of real estate taxes; and (7) proceeds from any loans to Owner (whether or not secured by all or any portion of the Project), financings, re-financings, or sale or other disposition of all or any portion of the Project or any interest therein.

(b)    Initial accounting software set up of Two Thousand Five Hundred Dollars ($3,500.00) plus actual cost of related software or hardware directly allocated to the Project.

(c)     The Project's direct share of salaries, wages, compensation and other costs associated with personnel, including but not limited to, fringe benefits, 401 K enrollment and contributions, medical and health insurance, processing fees, human resource management and information technology support, equipment, software licenses, maintenance, and support allocated to the Project Team (defined below) and directly arising from the Project in accordance with a written schedule setting out such salaries and wages and other benefits approved by Owner.

(d)     Marketing expenses incurred directly by Manager in connection with Manager's duties pursuant to Section 3. (b) of this Agreement.

(e)     The Projects direct share of the actual cost of contractors engaged to preform services in furtherance of the manager's duties under this agreement with prior Owner approval.

11.     Leasing Commissions. Owner will pay or reimburse Manager for all leasing commission costs incurred in the ordinary course of business of leasing the Project.

12.     Employees; Independent Contractors/Non-Solicitation. Manager shall have in its employ at all times a sufficient number of capable employees or subcontractors to enable it to properly, adequately, safely, and economically, manage, operate, and maintain the Project and, to maintain the books and records of account and perform the other accounting and other services for the Project as described in this Management Agreement. All matters pertaining to the employment, supervision, compensation, promotion, and discharge of such employees or subcontractors shall be the responsibility of Manager as to its respective employees and subcontractors, which shall be, in all respects, the employers of such employees and subcontractors. Manager shall fully comply with all Laws having to do with workmen's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other employer/employee related subjects. All employment arrangements are solely the concern of Manager and Owner shall have no liability with respect thereto. Owner shall have no right to directly supervisor or direct such employees and Owner specifically acknowledges: (i) the employees that work at the Project are employees of Manager; and (ii) that it will use its reasonable efforts to communicate all inquiries, comments and/or other matters associated with this Agreement or Project and the services rendered by Manager through the identified point of contact for the Manager, which, in most cases, will be the Manager's "Regional Property Manager". During the term of Owner's engagement of the Manager and for a period of twelve (12 months) from the voluntary or involuntary termination of Manager's engagement with the Owner for any reason whatsoever, Owner shall not (either an Owner's own account or for any person, firm, partnership, corporation, or other entity): (a) solicit, interfere with, or endeavor to cause any employee of the Manager to leave his or her employment, or (b) induce or attempt to induce any such employee to breech his or her employment agreement with the Manager. During the term of Owner's engagement of the Manager and for a period of twelve (12) month from the voluntary or involuntary termination of Manager's engagement with the Owner for any reason whatsoever, Owner shall not induce, encourage or cause any current customer of the Manager to cease its relationship with the manager.

13.     Insurance Carried by Manager. Manager shall maintain, at its cost and expense, the following insurance:

(a) Workers' compensation in the amount of any statutory limits;

(b) Employers' liability insurance with minimum liability limits of $1,000,000.00 each accident, $1,000,000.00 bodily injury by disease per employee and $1,000,000.00 bodily injury by disease policy limit;

(c) Commercial general liability insurance, naming Owner as an additional insured, with minimum limits of $5,000,000.00 per occurrence for bodily injury and property damage and $5,000,000.00 general aggregate;

(d) Automobile liability insurance covering owned, non-owned and hired automobile equipment with $1,000,000.00 combined single limit; and

(e) All employees of Manager who are authorized signatories or who in any way handle funds for the Project or Owner (on-site or off-site) shall be insured for dishonesty (e.g. fidelity and crime insurance) in the minimum amount of $1,000,000.00 with not more than a $25,000.00 deductible.

All insurance required pursuant to this Management Agreement shall contain a waiver of subrogation clause, so that no insures shall have any claim over or against Owner or Manager, as the case may be, by way of subrogation or otherwise, with respect to any claims that are insured under such policy. Owner and Manager hereby release each other from all rights of recovery under or through subrogation or otherwise for any and all losses and damages to the extent of such insurance coverage and agree that no insurer shall have a right to recover any amounts paid with respect to any claim against Owner or Manager by subrogation, assignment or otherwise. Upon Owner's written request, Manager shall furnish to Owner one or more certificates or other documentation reasonably requested by Owner (including, without limitation, copies of insurance policies or the declarations pages thereto) evidencing the insurance required to be carried by Manager under this Management Agreement.

14.     Indemnity. Manager shall, and Manager does hereby agree to, indemnify, defend, and hold harmless Owner and Owner's affiliates and their respective members, manager(s), directors, officers, and employees from and against any and all damages, demands, claims, payments, obligations, actions or causes of action, assessments, losses, liabilities, costs, and expenses, including, without limitation, penalties, interest on any amount payable to a third party, lost income and profits, and any legal or other expenses (including, without limitation, reasonable attorneys' fees and expenses) reasonably incurred in connection with investigating or defending any claims or actions, whether or not resulting in any liability (collectively, "Losses") (except to the extent covered by insurance carried by Manager or Owner) which Owner or Owner's members, manager(s), directors, or officers may suffer or incur, or which may be asserted against Owner or Owner's affiliates and their respective members, manager(s), directors, officers, and employees, whether meritorious or not, to the extent caused by the willful misconduct of Manager and Manager's affiliates and their respective members, manager(s), directors, officers, and employees, which indemnity shall continue notwithstanding the expiration or earlier termination of this

Management Agreement regarding any occurrence preceding such expiration or termination. Notwithstanding anything to the contrary in this Section, in no event shall the indemnity provided under this Section extend to any Losses to the extent the same is caused by the gross negligence or willful misconduct of Owner or its members, manager(s), directors or officers. The foregoing indemnification and hold harmless obligations shall survive the expiration or earlier termination of this Management Agreement.

15. <u>Fair Housing and Compliance with Laws</u>. It is understood and agreed that the property will always be managed in compliance with The Fair Housing Act, as amended, and all other Laws. Manager shall at all times in the performance of the services to be performed by it under this Management Agreement comply with all applicable present and future federal, state, county, municipal, or other governmental laws, statutes, ordinances, codes, regulations, decrees, rules, and orders, and all easements, covenants, conditions, and restrictions pertaining to or encumbering the Project (collectively, "Laws").

16. <u>Expenses</u>. Unless otherwise set forth in this Management Agreement: (a) All expenses expressly authorized by this Management Agreement and incurred in connection with the leasing, operation, and maintenance of the Project shall be the sole responsibility of Owner; and (b) Fees for professional services authorized by this Management Agreement and incurred in connection with the operation of the project shall be paid by Owner. Manager shall report to Owner promptly in writing all accidents and claims of which it is aware for damage and injury relating to the ownership, operation, and maintenance of the Project and any damage or destruction to the Project coming to the attention of Manager. Manager shall not settle on Owner's behalf any claims with Owner's insurers or any third-party claimant.

17. <u>Status of Manager</u>. It is understood and agreed that Manager is an independent contractor and this Management Agreement is not intended to provide or create any master/servant relationship between Manager and Owner. Manager agrees to indemnify and save harmless Owner from any and all Losses arising from or in connection with any acts beyond the scope of Manager's authority provided in this Management Agreement not otherwise expressly authorized or ratified by Owner in writing and against any and all claims which arise out of the gross negligence or willful misconduct of Manager. The indemnification and hold harmless obligations shall survive the expiration or earlier termination of this Management Agreement.

18. <u>Assignment</u>. Neither party may assign its rights or obligations under this Management Agreement without the prior consent of the other party, and any assignment made without the prior written consent of the other party shall be void. This Management Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their permitted successors and assigns.

19. <u>Amendment; Integration; Interpretation</u>. This Management Agreement constitutes the entire agreement between the parties and may not be amended without the written consent of Owner and Manager. This Management Agreement is a total and complete integration of any and all agreements existing between Manager and Owner and supersedes any prior oral or written agreements, promises or representations between them. Any captions or headings used in this Management Agreement are for convenience only and do not define or limit the scope of this Management Agreement.

20.     Attorneys' Fees. Should either party employ an attorney or attorneys to enforce any of the provisions hereof or to protect its interest in any manner arising under this Management Agreement, or to recover damages for the breach of this Management Agreement, the prevailing party in such action shall be entitled to recover all reasonable costs, damages and expenses, including attorneys' and experts' fees, and costs expended or incurred in connection therewith.

21.     Governing Law. This Management Agreement shall be deemed to have been made and shall be governed by and construed and interpreted in accordance with the laws of the State of Indiana without regard to conflicts of law principles. The parties hereto submit to personal jurisdiction in the State of Indiana for the enforcement of the provisions of this Management Agreement and waive any and all rights to object to such jurisdiction for purposes of litigation to enforce this Management Agreement.

22.     Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "Notice") shall be in writing and delivered to the addresses set out below, by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (b) a nationally or regionally recognized overnight courier company, whereby delivery is deemed to have occurred the business day following deposit with the courier; (c) registered United States mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the third business day following deposit with the United States Postal Service; or (d) electronic transmission (facsimile or email) if the transmission is completed no later than 5:00 p.m. Eastern time on a business day, whereby delivery is deemed to have occurred at the end of the business day on which electronic transmission is completed: to Manager at 8902 N. Meridian Street, Suite 205 Indianapolis, IN 46260, and to Owner at _____.

23.     Non-Waiver. The failure of Owner or Manager to seek redress for violation or to insist on the strict performance of any covenant, agreement, provision, or condition of this Agreement shall not constitute a waiver of the terms of such covenant, agreement, provision, or condition, and Owner and Manager shall have all remedies provided herein and by applicable law regarding any subsequent act which would have originally constituted a violation.

24.     Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

25.     Counterparts. This Agreement may be executed in multiple counterparts (including electronically signed and/or electronically distributed counterparts), all of which, when taken together, shall constitute one and the same document.

[Signature page follows.]

[Signature Page – Management and Accounting Service Agreement]
(                    )

EXECUTED effective as of the day and year noted above.

By: Mark Mosch
CEO - AndMark Management Co IV LLC, Manager of AndMark Investment Fund IV, Manager
AndMark Hidden Creek Apartments, LLC.

BIRGE & HELD PROPERTY MANAGEMENT, LLC

By:
Andrew J. Held, Manager

**Hidden Creek Apartments**
4800 Hall Road
Columbus, OH 43228

LEASE AGREEMENT     t0237896

**THIS IS A LEASE AGREEMENT**   Signed on: **12th December 2020** by. **AndMark Hidden Creek Apartments, LLC** as Owner. whose address for mailing of Rent and giving notice is    **4800 Hall Road, Columbus, OH 43228**   and by the following Residents.

**Pamela White**

By signing this Lease, the Owner and the Residents agree that the relationship between them is fully and accurately defined by this Lease, and both the Owner and the Residents promise to faithfully and completely perform all of their obligations under this Lease.

| 1. DEFINITIONS AND TERMS | (d) "Rent": | |
|---|---|---|
| (a) "Apartment": | (1) Pro-rated amount: | $467.74 |
|      Unit :    OB1004 | (2) Monthly Rent Charges: | |
|      Address:    1004 Oaks Blvd | **BASE RENT** | $725.00 |
|             Columbus, OH 43228 | | |
| (b) "Beginning Date":    12th December 2020 | | |
| (c)    "Ending Date":    31st December 2021 | | |
| | (3) Move In Special: | |
| |      TOTAL MONTHLY RENT: | $725.00 |
| | (e) "Security Deposit":    $350.00 | |
| |       "Pet Deposit":    $0.00 | |

(f) Utility Responsibility:    The monthly rent includes/does not include charges for the following utilities:

| | |
|---|---|
| Water / Sewer | Not Included Paid Directly by Resident |
| Electricity (including air conditioning) | Not Included Paid Directly by Resident |
| Garbage/Trash | Not Included Paid Directly by Resident |
| Natural Gas | Not Included Paid Directly by Resident |

(g) The Other Occupants of the Apartment are:

(h) Residents Automobiles
         Model:
         Year: 0
         Color:
         License no.

The Residents agree to notify the Owners of any changes to the Residents Automobiles and/or license numbers.

AndMark_000140

**EXHIBIT 2**

**2. AGREEMENT.** By this Lease Agreement, the Owner is renting the apartment to the Residents. In exchange, the Residents agree to pay the Rent promptly on or before the first day of each month, and to pay all other charges payable under this Lease when they are due. Further, both the Owner and the Residents agree to observe all the terms and conditions of this Lease. For so long as the Residents observe all of the terms of this Lease, the Owner agrees that the Residents may use the Apartment without interruption by the Owner, except where this Lease says otherwise.

**3. TERM.** This Lease will begin on the Beginning Date and will continue until the Ending Date. If neither the Owner nor the Residents notify the other party at least sixty (60) days before the Ending Date that this Lease will terminate, then this Lease will continue beyond the Ending Date on a month to month basis until either the Residents or the Owner gives at least sixty (60) days prior written notice to the other party that this Lease will terminate. The Rent or other charges payable by the Residents or any other terms and conditions of this Lease may be changed by the Owner after the Ending Date by giving at least sixty (60) days prior written notice to the Residents of the change.
**NOTE: If you want to vacate the Apartment on or after the Ending Date, you must notify the Owner in writing at least sixty days (60) before the date on which you want to terminate.**
While this Lease is supposed to begin on the Beginning Date, the Owner does not promise that the Apartment will be ready and available for the Residents on the Beginning Date. If the Residents are not able to enter and occupy the Apartment on the Beginning Date because the Apartment is not ready for occupancy, because a previous Resident has not yet moved out, or because of any cause reasonably beyond the Owner's control, then this Lease will not begin until the Owner determines the Apartment is ready and available for occupancy. No Rent or other charges will be due from the Residents until this later Beginning Date, and the Owner will not be liable for any damages to the Residents because of this later Beginning Date.

Initials:                                                                                          **Resident**



**4. RENT.** The Residents promise and agree to pay the Rent stated in Paragraph 1(d) in advance on or before the first day of each month without the Owner notifying the Residents of any Rent due. The Residents also promise and agree to pay all other charges imposed by this Lease within ten (10) days of the Owner's bill to the Residents. If Rent and other payments are not paid via Automated Clearing House (ACH) withdrawal, then the Resident will pay a convenience fee of $10.00. If the Owner has not received the Rent by the 5th day of the month, then the Resident will pay a late charge of $50.00. If the Owner has not received the Rent by the 11th day of the month, then the Resident will pay an additional late charge of $100.00. Late charges will be added to the Residents account and will be paid by the Residents regardless of whether the Owner bills the late charges to the Residents. The Owner's failure to bill the late charges will not waive the Owner's right to collect the late charges, and Owner's right to collect late charges will be in addition to its other rights and remedies under the Lease. If any Rent payment has not been received by the Owner by the 3rd day of the month, or if the Residents fail to pay any other charges billed to them by the Owner within ten (10) days allowed, then the Owner may terminate this Lease and pursue the remedies described in Paragraph 29 and 30 of this Lease. The Residents may also be responsible for any attorney fees and court costs specifically allowed by Law. Any check which is returned to the Owner because the Resident's bank does not honor the check for any reason will be treated as if no payment had been made at all, and in addition, Residents will pay a returned check fee. Rent shall include all payments required to be made by Resident to Owner under the terms of this Lease including Base Rent defined in Paragraph 1(d), Late Charges, Utility Charges and utility service charges.
**Residents Initials:**

**5. RENT INCREASES.** The total monthly Rent may be increased by the Owner to cover additional costs incurred by the Owner in operating the Apartment Community because of increases in ad valorem property taxes, charges for the electricity, heating fuel, water or sanitary sewer services consumed at the Apartment Community, or increases in premiums paid by the Owner for liability, fire or worker compensation insurance. Any additional costs, which result in increases in Rent payments, will be allocated equitably among all the Residents in the Apartment Community. Any Rent adjustment will not take effect until at least thirty-days (30) after the Owner has given written notice to the Residents.

**6. CHARACTER OF OCCUPANCY.** The Residents understand and agree that the apartment is to be used exclusively as a private residence for the Residents and the Other Occupants listed in Paragraph 1 on this Lease, and for no other persons or purposes. The Residents also agree that they will not operate any business enterprises from the Apartment, conduct "garage sales" or make any other unusual use of the Apartment, which might violate the rights of the Owner or the other Residents. The Residents understand that the Owner may terminate this Lease if the Residents fail to fully comply with the terms of this Paragraph.

**7. USE OF THE APARTMENTS.** The Residents understand and agree that they will not use the Apartment for any purpose in violation of the laws, ordinances or regulations of any governmental authority. The Residents agree to furnish the Apartment and install draperies or other window treatments with white linings or surfaces on the exterior so that the Apartment Community will have a uniform and consistent appearance. The Residents also agree to keep the Apartment in a clean and orderly condition, and not to do anything that might be

considered dangerous, might be a health hazard or might violate any health or police regulations. The Residents also agree that they will not engage in any activity or do any act which might cause the Apartment to diminish in value, and that they will not misuse or neglect the Apartment or any of the Owner's property or appliances in the Apartment. The Residents understand and agree that they will be responsible for the conduct and actions of all Other Occupants of the Apartment and all guests and visitors to the Apartment, and the Residents will be responsible to see that those persons fully comply with all of the obligations of this paragraph and with all of the other obligations in this Lease.

**8. RESPONSIBILITY TO OTHER RESIDENTS.**   The Residents understand that they are living in a multiple residence apartment Community and that the mutual cooperation of all Residents with each other and with the Owner is essential to make the Apartment Community a pleasant residence for everyone. Because of this, the Residents agree to act in an orderly fashion and not to do anything which might be a disturbance, nuisance or an eyesore to the other Residents, and to cause all Other Occupants of the Apartment, and all guest and visitors to the Apartment to conduct themselves in the same manner.

**9. OBLIGATIONS ON MOVING IN.** The Residents acknowledge and agree that the Owner has made no representations or warranties as to the condition or the state of repairs of the Apartment or the Common Areas prior to the signing of this Lease. On or before the Beginning Date, the Owner will furnish two (2) copies of an Inventory Checklist to the Residents. The Residents must review the Inventory Checklist, and note on the Checklist the condition of the Apartment and all of the Owner's property in the Apartment. One copy of the Checklist must then be returned to the Owner within seven (7) days of the Beginning Date.
**FAILURE OF THE RESIDENTS TO COMPLETE THE INVENTORY CHECKLIST WILL BE DEEMED AN AGREEMENT BY THE RESIDENTS THAT THE APARTMENT AND THE OWNER'S PROPERTY IN THE APARTMENT IS IN GOOD, CLEAN UNDAMAGED AND SERVICEABLE CONDITION AT THE BEGINNING DATE.**
If the Residents believe that the apartment is in need of repairs, which are the Owner's responsibility, the Residents should deliver a written list of those items to the Owner within seven (7) days together with the completed Inventory Checklist.

**10.  CARE OF THE APARTMENT.**   The Residents understand and agree that they have been entrusted with valuable appliances and property. The Residents agree that they will not misuse or mistreat the Apartment or any of the appliances and other property in the Apartment, and that they will treat the Apartment and all of the Owner's property in the Apartment and the Apartment Community with the respect and care that is due and owning by a person who has been entrusted with the property of another. The Residents also agree that they will not permit any misuse of neglect of these appliances by any person, and that all malfunctions or damages will be promptly reported to the Owner.

**11. ALTERATIONS.** The Residents may not make any alterations, additions or improvements to the Apartment (including wallpaper) unless they first obtain the written consent of the Owner. All alterations, additions and improvements must be done in a good workmanlike manner using high quality materials, and must be done in such a fashion as to not disturb other Residents. The Residents will not allow or permit any mechanic's lien or other lien to be filed against the Apartment or any part of the Apartment Community as a result of any of the Resident's repairs, alterations or improvements. The Residents understand and agree that they are obligated to remove all alterations, additions and improvements made by them and to restore the Apartment to the condition it was in on the Beginning Date (reasonable wear and tear excepted) whether or not the Owner has consented to the making of the alterations, additions or improvements.

**12. COMMON AREAS.**   The Apartment Community has been designed as a residential community, and it may contain certain Common Areas for the convenience and the mutual use and benefit of all Residents in the community, such as parking lots, hallways, swimming pools, recreation areas, decks, lounge areas, community centers, laundry facilities, tennis courts or other athletic facilities. The Residents agree to use these Common Areas only for the uses for which they were intended, to obey all rules and regulations relating to the Common Areas, and to act with due respect for the rights of other who use and enjoy the Common Areas. The Residents agree to see that the Other Occupants of the Apartment, and all guests and visitors also observe the obligations of this Paragraph. The Residents understand that the Owner is under no obligation to provide any of the Common Areas described above, and that the Owner may construct new Common Areas or close existing Common Areas as the Owner deems fit. The Residents also understand and agree that the Residents and the Other Occupants of the Apartment and all guests and visitors who may use the Common Areas do so at their own risk, and that the Owner is not responsible or liable for any loss or injury to any person because of any use of the Common Areas except for losses or injuries resulting from the Owner's negligent performance or failure to perform a duty imposed by law.

**13. STORAGE.**  Residents may store their personal possessions, belongings and furniture only in their Apartment or in any storage areas designated for the Residents use by the Owner. In no event may the Residents store any explosives, flammable or other dangerous items anywhere in the Apartment Community. If a storage area outside of the Apartment is designated for the Residents use, the Residents will purchase and install a sturdy lock on the door, and will periodically examine the stored items. In no event may the Residents store any personal possessions, bicycles, belongings or furniture on the balcony of the Apartment, if any, or in the hallways or other Common Areas. Further, the Residents agree that they will not store any perishable items, or any items, which would cause odors, in any of the storage areas. The Residents understand and agree that any use of the designated storage areas is at their own risk, that they should not store any valuables in the storage areas, and that the Owner cannot give the Residents any assurances against theft or other damage.

**14. PARKING AND SNOW REMOVAL.** The Residents agree that they will park automobiles only in their carports, if any, and in the other areas specifically designated by the Owner as being available for parking purposes. In no event will the Residents or their guests park in any fire lanes, garbage removal and pickup areas, or in any streets which are not generally available for parking. The Residents further agree that they will use the parking areas solely for the purpose of parking the Residents Automobiles. Automobiles not used on a regular basis, campers, snowmobiles, trucks, commercial vehicles, recreational vehicles and motorcycles may not be stored or brought into the Apartment Community. Prohibited vehicles may be towed away by the Owner at any time with no prior notice. Because of the problems connected with

snow removal and other cleaning of the parking areas, automobiles that do not appear to have been moved within any 72-hour period may be towed away by the Owner at the Residents expense. In this event, the Owner will give prior notice to the Residents by placing a sticker on the automobile. Automobiles parked in any prohibited areas or which cause any obstruction to traffic may be towed away without notice and at the Residents expense. The Residents should always notify the Apartment Manager in writing if they intend to leave any of the Residents Automobiles in the parking lots for any extend period of time, as for vacations or because of illness, so that such Automobiles will not be towed. The Residents should always notify the Apartment Manager in writing if they intend to leave any of the Residents Automobiles in the parking lots for any extended period of time, as for vacations or because of illness, so that such automobile will not be towed.

**15. RULES AND REGULATIONS.** The Owner reserves the right to establish reasonable rules and regulations relating to the use of the Common Areas in the Apartment Community, and to establish other reasonable rules and regulations as the Owner may consider necessary for the general welfare, health and comfort of all Residents in the Apartment Community, and for the protection of the buildings and property in the Apartment Community. The Residents promise and agree to obey all of the rules and regulations that are in effect from time to time and to see that all Other Occupants of the Apartment, and all guests and visitors also observe the rules and regulations. The Owner also reserves the right to change the rules and regulations from time to time as the Owner finds necessary. Changes in the rules and regulations to protect the physical health, safety or peaceful enjoyment of the Residents of the Apartment Community and their guests will take effect thirty (30) days after written notice to the Residents.

**16. ASSIGNMENT.** The Residents expressly understand and agree that they will not assign any part of their interest in this Lease, nor will they sublet the Apartment nor allow anyone other than themselves and the Other Occupants of the Apartment to occupy the Apartment, unless they first obtain the written consent of the Owner which the Owner may withhold for any reason whatsoever. Unless the prior written consent of the Owner is obtained any assignment or subletting of the Lease or the apartment will be void and completely ineffective, and will be a default allowing the Owner to regain possession of the Apartment. Whether or not the Owner consents to any assignment, the Residents will not be released from any of their obligations under this Lease unless the Owner waives those obligations in writing. Consent by the Owner to an assignment or subletting does not include consent to any further assignment or subletting.

**17. UTILITIES** - The Residents agree to promptly pay all bills for energy, electricity, trash removal and utilities supplied to the Apartment from and after the Beginning Date which are indicated in Paragraph 1(f) to be paid by the Residents. The Owner may change the method of providing energy, electricity, trash removal and utilities and separately meter any energy, electricity, trash removal or utility, in which event the Residents shall also pay directly to the provider for any separately metered energy, electricity, trash removal or utility which provides service to the Apartment. Residents understand that any utility service will be provided by the local utility company or provider, and at Owner's sole discretion, may be billed on a sub-metering or allocation basis. Owner has, or may install during the term of the Rental Agreement, separate sub-meters or allocation devices which register or allocate Residents' utility consumption. Owner may employ the services or a third party utility biller to calculate and bill Residents for any utility consumption. The Owner has the right to temporarily discontinue or cut-off any of the utilities for any repairs deemed necessary by the Owner without responsibility or liability to the Residents. The Owner will not be responsible or liable to the Residents for any loss or damage resulting from the discontinuance in any utility service caused by any strike, fire, storm or other casualty, or for any reason beyond the control of the Owner. The Residents understand and agree that a portion of the heat, water, air conditioning and/or electricity supplied to the Apartment may be diverted to the hallways and other Common Areas in the building in which the Apartment is located. The Residents will not be entitled to any reduction or repayment of the Rent or utility charges because of this diversion of heat, air conditioning and/or electricity. The third party firm currently charges an administrative fee of $3.50 per month for sub metering water and sewer and trash removal. The administrative fee may be revised. If the Residents do not have the utilities transferred to their names by the Beginning Date of the Lease Agreement, the Owner will charge the amount of the billing and a fifty ($50.00) service charge for each bill received.

*(signature)*

Residents Initials:

**18. OWNER'S DUTY TO REPAIR.** The Owner agrees to keep the Apartment in reasonable repair during the term of this Lease so that the Apartment will be fit for the use for which it was intended, provided that the Residents promptly notify the Owner of any condition in the Apartment that is in need of repair. If any repairs are made necessary or become more costly because of the acts, misuse or neglect of the Residents, the Other Occupants of the Apartment, or guests or visitors to the apartment, or because of the failure of the Residents to notify the Owner of any condition in need of repair, then the Residents agree to pay the Owner for the cost of making the repairs.

**19. ACCESS TO THE APARTMENTS.** The Residents expressly agree that the Owner, or persons designated by the Owner, will have access to the Apartment at all reasonable hours for the purpose of inspecting the apartment, showing it to prospective purchasers, for any purposes permitted by Ohio Revised Code Section 5321.05(B), or for the purpose of performing any maintenance or for making any repairs or alterations to the Apartment or the building in which the Apartment is located. After either the Owner or the Residents give notice that this Lease will terminate, the Owner may show the Apartment to prospective Residents.

**20. CONSTRUCTION ACTIVITIES.** If the Apartment Community is under construction at the Beginning Date, the Residents understand that they may be permitted to move into the Apartment before the construction of the Apartment Community is finished. Also, the Residents understand that additional buildings or other facilities or improvements may be constructed during the Residents occupancy of the Apartment, and that the Owner may develop additional property and add to the size of the Apartment Community. Therefore, the Residents understand that these conditions and activities may cause the types of inconveniences normally occurring during construction, such as incomplete or temporary facilities, dirt, dust, mud, noise and debris, and the Residents will accept these conditions without complaint and will not be entitled to any reduction of Rent because of these conditions.

**21. RIGHT TO MORTGAGE.** The Residents understand and agree that this Lease is and will be subject and subordinate to all present and future mortgages affecting the Apartment Community, and that the Rents and Leases may be assigned by the Owner to its mortgage lender as security for the repayment of any mortgages affecting the Apartment Community.

**22. SECURITY DEPOSIT.** The Residents understand that they have given a Security Deposit to the Owner, which will be kept by the Owner as assurance that the Residents will perform all of their obligations under this Lease. If the Residents fail to pay the Rent or any other charges imposed by this Lease, or if the Residents fail to perform any of their other agreements or obligations under this Lease or under Ohio Revised Code Section 5321.05, then the Owner may, at its option, apply the Security Deposit against any damages suffered by the Owner. The Owner's right to recover possession of the Apartment for non-payment of Rent or for any other reason will not be affected by the fact that the Owner holds the Security Deposit. The Security Deposit will be returned to the Residents at the end of the Lease term if the Owner does not claim damages for failure to pay Rent or other charges. In no event will the Security Deposit be returned to the Residents before the Residents have moved out of the Apartment.

### You must notify your Landlord in writing within four (4) days after you move of a forwarding address where you can be reached and where you will receive mail; otherwise, your Landlord shall be relieved of sending you an itemized list of damages and the penalties adherent to that failure.

**24. CONVERSION OF COMMUNITY.** The Residents understand and agree that the Owner may, at any time, convert the Apartment Community to a condominium or co-operative development. If the Apartment Community is converted and the Apartment units are to be sold to the public, the Owner may elect to terminate this Lease by giving the Residents at least 120 days prior written notice.

**25. NOTICE OF INJURIES.** In the event that any of the Residents or Other Occupants of the Apartment or any of their guests and visitors suffer any damage or injury for which they believe that the Owner might be liable, the Residents promise and agree to notify the Owner within ten (10) days of the occurrence of the injury, or as soon after the injury as practicable. The failure of the Residents to notify the Owner of any of these injuries or damage will be a breach of this Lease, and the Residents will be responsible to the Owner for any loss which the Owner might suffer arising out of the Residents failure to notify the Owner, including the Owner's liability to determine the cause or responsibility for the injuries or damage.

**26. LIABILITY OF RESIDENTS.** Notwithstanding any property or liability insurance that the owner may have, the Residents will be responsible for the use of the Apartment and the Common Areas by Residents, the Other Occupants, and all guests and visitors to the Apartment, and will be liable to the Owner for any property damage loss, including but not limited to a fire, or personal injury incurred by the Owner as a result of the use of the Apartment or the Common Areas or the conduct or actions in the Apartment Community of the Residents, the other Occupants and all guests and visitors to the Apartment. The Residents will also be liable to the Owner if the Owner becomes liable to any other person because of the use of the Apartment or the Common Areas or the conduct or actions in the Apartment Community of the Residents, the Other Occupants or any guests or visitors to the Apartment.

**27. LIABILITY OF OWNER.** Except for the Owner's failure to perform, or negligent performance of a duty imposed by law, the Owner will not be responsible or liable to the Residents, the Other Occupants or to any guests and visitors for any personal injury, loss or damage to property, or for any other loss or injury whatsoever that may result from the acts or omissions of the Owner, other Residents, guests, visitors or trespassers in the Apartment Community, or for any acts of God or for any other acts, causes or reasons not reasonably within the control of the Owner.

**28. CONDEMNATIONS AND DESTRUCTION.** If any part of the Apartment (other than the carport) is taken by any governmental authority, or if the Apartment is damaged by fire, storm or other casualty, and if the Residents are unable to continue living in the Apartment, then either the Owner or the Residents may declare this Lease to be at an end, and the Residents shall immediately move out of the Apartment. If the damage can be repaired by the Owner within a reasonable time, and if the Residents can still use the Apartment without substantial inconvenience, the Owner shall repair the Apartment as soon as is reasonably practicable, and this Lease shall continue in full force and effect. Any taking of or damage to any of the parking areas or other Common Areas will not release the Residents from any of their obligations under this Lease. All damages for any governmental taking will belong solely to the Owner.

**29. DEFAULT IN PAYMENT OF RENT OR OTHER CHARGES.** The Residents expressly understand and agree that a failure to promptly pay the Rent or any other charges imposed by this Lease is a default in the Residents obligations. In such event, the Owner will have the right to declare this Lease terminated, and upon giving three (3) days notice, the Owner will have the right to evict the Residents and to recover possession of the Apartment by whatever means are allowed by law. Acceptance of late payments by the Owner will not impair any of the Owner's remedies as set forth in this Lease or as allowed by law.

**30. OTHER DEFAULT.** If the Residents fail to faithfully and completely perform any of their promises or obligations under this Lease (other than the obligation to pay Rent and other charges), the Owner will have the right to declare this Lease terminated, and upon giving thirty (30) days notice, the Owner will have the right to evict the Residents and to recover possession of the Apartment by whatever means are allowed by law. The Owner also will have all the rights provided by this Paragraph if the Residents have been late in the payment of two or more Rent payments or other charges within any one-year period. If the Residents willfully or negligently cause a serious and continuing health hazard, or cause extensive and continuing physical injury to the premises, the Owner has the right to declare this Lease immediately terminated and, after three (3) days notice, to evict the Residents and recover possession by whatever means are allowed by the law.

Breaches of lease under ORC 5321.05 may result in a 30 day notice to vacate. All other breaches falling under ORC 1923 may be served a 3 day notice for said breaches lease.

**31. OWNER'S RIGHTS.** Upon the termination of this Lease by the Owner because of a default by the Residents, or upon abandonment of the Apartment by the Residents, or upon re-entry and recovery of the Apartment by the Owner, the Residents liability for Rent due will survive as allowed by law. In any of these events, the Owner may declare that all Rent and other charges remaining to be paid during the term of the Lease are then due and payable in full or the Owner may seek to collect the Rent and other charges as they fall due despite the re-entry or recovery of the Apartment by the Owner. The Owner's claim for any losses or damages will survive the termination of the Lease or the recovery of the Apartment by the Owner, and the Residents will remain liable for all such losses and damages. If the Owner accelerates the remaining Rent and other charges to be paid during the term of the Lease, the Residents may not be liable for the total accelerated amount since the Owner will attempt to minimize damages and either party may have a court determine the actual damages. Either party may have a court determine the actual amount owed, if any. If the Owner chooses to collect the Rent and other charges as they fall due, the Owner will seek new Residents for the Apartment and will credit to the Residents account any income resulting from the re-leasing of the Apartment, however the Residents will not be entitled to any excess income received by the Owner over the amounts owing from the Residents to the Owner. In any of these events, the Owner will also be entitled to reasonable fees for its costs and expenses incurred in re-leasing the Apartment

**32. RESIDENTS DUTY ON MOVING OUT.** Upon moving out, the Residents will clean the walls, floors and appliances, remove all their possessions and return the Apartment to the Owner in as good condition as it was in when the Residents moved in, except for reasonable wear and tear. If the Residents have made any alterations or additions to the Apartment, the Residents will remove the alterations and restore the Apartment. If the Residents accepted the apartment with any alterations or additions, including wallpaper, they will be responsible for removal and restoration of the Apartment when they vacate. The Residents must return all of their keys and any ID or gate passes to the Owner on the day that they move out of the Apartment. The Resident will be responsible for rent until all keys are returned to the Owner. The Owner may charge the Residents Fifty Dollars ($50.00) for each item that the Residents fail to return.

**Resident Initials:**



**33. ABANDONED PROPERTY.** If the Residents leave any property or possessions in the apartment Community after moving out of their Apartment, the property will be deemed abandoned. The Owner may send the abandoned property to a storage company and charge the Residents for the storage costs, store the abandoned property charging a reasonable storage fee to the Residents, or dispose of the abandoned property in any manner and at any time not prohibited by law.

**34. HOLDING OVER.** In the event that the Residents do not move out of the Apartment by the ending date of the lease, Owner then may, at its option, treat Residents as trespassers. In the event that Residents remain in the Apartment unit after the ending date without a new or renewal lease agreement, and the Owner does not notify the Residents of another total monthly amount, the total monthly amount shall be $300.00 more than the total monthly amount for the month prior to the end date.

**35. INFORMATION DISCLOSURES.** The Residents understand that various credit institutions, mortgage lenders, governmental agencies, landlords and other persons may contact the Owner from time to time to request information regarding this Lease transaction between the Residents and the Owner, and the Residents consent and agree that the Owner may freely disclose any information contained in the Owner's files and records.

**36. NOTICES.** Unless this Lease or any statute calls for a specific method for notices to be delivered, any notice required to be given by this Lease will be considered to be properly delivered if it is sent by first class mail or personally delivered to the party being notified. Notices to the Owner will be sent or delivered to the address shown on the first page of this Lease, unless the Residents are notified of a different address. Notices to the Residents will be sent or delivered to the Apartment unless the Owner is notified of a different address. In addition, the Owner may deliver any notice to the Residents by attaching the notice to any doors or doorframe of the Apartment unless the Residents have moved out of the Apartment and notified the Owner of their new address.

**37. APPLICATION FOR TENANCY.** Prior to the signing of this Lease by the Residents and the Owner, the Residents signed an Application for Tenancy, in which the Residents gave several items of factual data, and made other representations to the Owner. The Residents understand that the Owner relied on those facts and representations, and that if any of those facts or representations is discovered to be false or incorrect, the Residents will be in breach of this Lease.

**38. MODIFICATION.** Both the Owner and the Residents understand that the whole agreement between them is expressed in this Lease and that there are no verbal understandings and agreements. Except where this Lease says that a change may be made, this Lease may be changed only by a written agreement signed by both the Residents and the Owner, and any verbal understandings or agreements will not be binding on either the Residents or the Owner. However, the Owner may change this Lease without the consent of the Residents by giving a written notice of the adjustment to the Residents thirty (30) days or more before the change takes effect if the change to this Lease is required by federal, state or local law or regulation.

**39. JOINT AND SEVERAL LIABILITY.** Each of the Residents, if there is more than one Resident, shall be fully liable for all Rents and other sums due, and the Owner may look to all or any one of the Residents for the full satisfaction of any obligation under this Lease, and a judgment against any Resident shall not be a bar to a judgment against any other Resident.

**40. INTERPRETATION OF LEASE.**   It is the intention of the Owner that this Lease be written in a readable form without the use of technical language, except where it was unavoidable. The Residents are, however, encouraged to assure themselves that they understand everything in this Lease, and to seek assistance if they do not.

**41. SEVERABILITY AND CAPTIONS.**  If any provision contained in this Lease is prohibited by statute or is declared unenforceable as a result of any judicial decision, then that provision will be null and void, and will not be considered a part of this Lease. If any provision in this Lease is invalidated or becomes void, the remainder of the Lease will not be affected and will remain in full force and effect. The captions and numbers have been inserted only as a matter of convenience, and are not part of this Lease Agreement.

**42. SENIOR CITIZEN HOUSING.**  In the event the Resident has occupied the Leased Premises for more than thirteen (13) months, the Resident may terminate the Lease by a sixty (60) day written notice to the Landlord if one of the following occur:  **(a)** The Resident becomes eligible during the lease term to take possession of a subsidized rental unit in senior citizen housing and provides Landlord with written proof of that eligibility. "Senior citizen housing" means housing for individuals 62 years of age or older that is subsidized in whole or in part under any local, state or federal program. **(b.)** The Resident becomes incapable during the lease term of living independently, as certified by a physician in a notarized statement.

**43. MOISTURE.**    Resident acknowledges that it is necessary for Residents to provide appropriate climate control, keep the Apartment clean, and take other measures to retard and prevent moisture, mold and mildew from accumulating in the Apartment. Residents agree to clean and dust the Apartment on a regular basis and to remove visible moisture accumulation on the windows, walls and other surfaces as soon as reasonably possible. Resident agrees not to block or cover any of the heating, ventilation or air conditioning ducts in the Apartment. Residents also agree to immediately report to the Owner: (i) any evidence of a water leak or excessive moisture in the Apartment, as well as in any storage room, garage or other common area; (ii) any evidence of mold or mildew-like growth that cannot be removed by simply applying a common household cleaner and wiping the area; (iii) any failure or malfunction of the heating ventilation or air conditioning system in the Apartment; and (iv) any inoperable doors or windows. Residents further agree that Residents shall be responsible for damages to the Apartment and Residents property as well as personal injury to Residents and Occupants resulting from Residents' failure to comply with the terms of this.
**The Owner recommends that the air conditioning be used at the times during warm or humid conditions.**
A default under the terms of this shall be deemed a material default under the terms of the Lease, and Owner shall be entitled to exercise all rights and remedies at law or in equity.

**44. SATELLITE DISHES AND ANTENNAS.**    It is illegal to attach anything permanently to a building or structure of any kind without the permission of the Owner. The Owner maintains the right to give permission for installations that are to be attached to the building with screws or some other means making it a permanent installation. In the event a special mounting is required a $50.00 fee must be paid if approved. Anything attached to the building during installation, such as the mounting brackets, wire and wall jacks must be left on the building when moving. Permission will be given based on the aesthetic effect of the dish on the building and whether the work can be done professionally, without causing permanent damage to the structure. Any systems installed without approval or installed in a manner other than described by the installer, will be removed and the Resident will be charged for the removal and any repairs. Owner is not responsible for any adjustment that may be required if the equipment has to be removed to work on the building. There is a one hundred ($100) fine for roof mounted and unapproved dishes.
**A written application must be completed and approved prior to any installations.  Do not make an appointment with your installer until you have been approved.  Application approval may take up to ten days (10) to process.**

**Resident**
Initials:

**45. VACATING OR ABANDONMENT PRIOR TO THE ENDING DATE.** If for any reason, the Apartment is vacated or abandoned by Residents prior to the Ending Date without payment of Rent through the Ending Date and fulfillment of all other obligations under this Lease Agreement, the Residents shall also pay an early lease termination fee of four (4) months' Rent and pay back any incentive, special, and promotion reflected on the Lease Agreement.  The Residents may reduce the four (4) month early lease termination fee by providing at least sixty (60) day notice, in writing, to Landlord, pay an early lease termination fee of two (2) months' Rent after vacating or abandoning the Apartment and pay back any incentive, special, and promotion reflected on the Lease Agreement.  The Landlord shall determine the actual date of vacating or abandonment upon the receipt of all the keys to the Apartment.

**46. MORTGAGE VERIFICATION.**   Resident agrees to pay the sum of fifty-dollars ($50.00) per mortgage verification forms filled out by Owner. Resident shall pay this fee at the time of submission of the form to Owner. Until such fee is paid, Owner shall not complete the form.

**47. RENT INCENTIVES / PROMOTIONS.**   It is fully understood by the Resident that if for any reason this Lease Agreement is not fulfilled, Resident will be liable to immediately repay the total amount of rent incentive/promotion in full.  **Resident Initials:**

**48. ANIMALS.** No animals (including mammals, reptiles, rodents and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless Owner authorized in writing. If an animal has been in the apartment at any time during your term of occupancy without consent, we will charge you a $500.00 fee for deodorizing, shampooing and flea treatment, in addition to all the following:
If Owners agrees to allow Resident having an animal in the Apartment, the Resident agrees to pay without fail to the Owner, a fee, which is non-refundable plus a pet security deposit, due upon move-in. It is further agreed that the Resident shall observe the following rules:
(a)   Resident agrees to pay pet rent and deposit listed on #1(d) and #1(e).
(b)   The pet shall be kept on a leash at all times when outside the apartment. This is in accordance with the leash laws. The pet shall be maintained in a manner, which will insure aesthetic and sanitary conditions inside the Apartment, and shall not be allowed to create a nuisance of any kind.
(c)   The pet shall eliminate its' waste on the perimeter of the property, away from the landscaped areas. Resident must carry something to dispose of pet waste. Resident will be fined for violation. The first offense fine will be fifty-dollars ($50.00), second offense fine will be one hundred-dollars ($100.00), and third offense will result in eviction of pet. The pet may not be left unattended outdoors even on a staked leash.
(d)   Residents will reimburse the Owner for the total cost to replace the carpeting and padding throughout the Apartment if any portion of the carpeting or padding is stained, permeated by pet odor, or damaged in anyway.

**49. FITNESS CENTER, POOL AND/OR SPA (IF APPLICABLE).**  The control card or key issued to the Residents upon move in will allow access to the fitness center. Residents understand and agree that the fitness center is available for use during designated business hours. The hours are subject to change at the discretion of the Owner. Residents will be charged $50.00 for any replacement card or key due to loss or damage. In consideration for the use of the fitness room facilities, pool and/or spa, it is expressly agreed that all use of the Exercise Room facilities, pool and/or spa shall be undertaken by a Resident or any Resident guest at his/her sole risk, and the Owner and all of its employees and agents shall not be liable for any injuries or any damages to any Resident or guest, or be subject to claim, demand, injury, or damages whatsoever, including but not without any limitation those damages resulting from a Resident or guest's actions. The Resident/guest for him or herself, and on behalf of his or her executors, administrators, and assignees does hereby expressly forever waive, release, discharge, and indemnify the Owner, as well as its managers, officers, employees, and agents for all such claims, demands, personal injuries, damages incurred, including but not limited to actual attorney fees.

**50.  GARAGES (IF APPLICABLE).**  Residents may not make any alteration, additions or improvement to the garage unless they first obtain the written consent of the Owner. The Residents understand and agree that if any alterations are made, the garage must be restored to the original condition upon moving out. Residents will be charged $100.00 for any garage door opener replacement due to loss or damage.

**51.  DRUG POLICY.**  Resident, and member of the Resident's household, guest, visitor or other person under the Resident's control: (a) shall not engage in criminal activity, including drug related criminal activity, on the said premises. "Drug related criminal activity" means the illegal manufacture, sale, distribution, use or possession with intent to manufacture, sell, distribute or use of a controlled substance, (b) shall not engage in any act intended to facilitate criminal activity, including drug-related activity, (c) shall not permit the dwelling unit to be used for, or to facilitate criminal activity, including drug related criminal activity, regardless of whether the individual engaged in such an activity is a member of the household, visitor or a guest; (d) shall not engage in the unlawful manufacturing, selling using, storing, keeping or giving of a controlled substance at any location within the apartment community; (e) shall not engage in any illegal activity including prostitution, criminal street gang activity, threatening or intimidating actions, assault, including but not limited to the unlawful discharge of firearms, within the apartment community or any breach of the Lease Agreement that jeopardizes the health, safety and welfare of the Owner, its agent or other Residents or which may result in serious property damage. Any violation of the above provisions shall be a material violation of the terms of the Lease Agreement and be good cause for termination of tenancy. It is understood that a single violation of this provision shall be deemed a serious violation, a material and irreparable noncompliance, and shall be good cause for immediate termination of the Resident's occupancy. Resident covenants and agrees to at all times comply with the provisions of Ohio Revised Code Section 5321.05, and acknowledges that if Resident shall violate the terms of this section 51, Owner shall have all rights and remedies set forth in Ohio Revised Section 5321.05 (C)(2).

**52. LIABILITY INSURANCE REQUIRED BY RESIDENT and RENTERS INSURANCE RECOMMENDED FOR RESIDENT.**
Resident acknowledges that property or liability insurance maintained by Owner does not protect against loss or damage to Resident's personal property or belongings, or cover Resident's liability for loss or damage caused by the actions of Resident or any visitor or occupant of the unit. Resident also acknowledges that by not maintaining a policy of personal liability insurance, he/she may be liable to others, including, if applicable, Owner, for loss or damage caused by the actions of Resident or any visitor or occupant in the unit. Resident further acknowledges receipt of notice from Owner requiring Resident to maintain a policy of personal liability insurance, which provides limits of liability to third parties in an amount not less than $50,000 per occurrence. Resident agrees to maintain at Resident's sole expense, during the Term of the Lease and any subsequent renewal periods, a policy of personal liability insurance satisfying such requirements. This liability insurance does not protect the Resident against loss or damage to Resident's personal property or belongings, only a renter's insurance policy does this.

Owner recommends that Residents also obtain a Renters' Insurance Policy to protect Residents' personal property.
Resident further acknowledges that Owner has made available to Residents a program (the "Program") providing Residents with a opportunity to purchase policies of renter's insurance or personal liability insurance directly from certain member companies of ePremium Insurance. However, Resident is under no obligation to purchase renters' insurance or personal liability insurance through the Program. In the event that the policy is cancelled or becomes inactive, Owner shall have the right, but not the obligation, to procure a GL Policy on the residents behalf. Resident understands that a non-compliance fee in the amount of $25.00 per month will be levied to reimburse Owner for administrative costs associated with placing and monitoring such coverage, and shall be deemed additional rent.
Resident hereby makes the following election with respect to personal liability insurance (INITIAL ONE):

[ ]        Resident agrees to purchase personal liability insurance from ePremium Insurance through the Program.

Or

[ ]        Resident agrees to purchase personal liability insurance from an insurance company of the Resident's choosing (other than through ePremium Insurance.) If Resident elects to purchase the required insurance from a company other than ePremium Insurance. Resident will provide the Owner with written proof of compliance on or prior to the Beginning Date (1.b) of this Lease. and from time to time thereafter upon Owner's request.

## RULE AND REGULATIONS

R1.  The sidewalks, entrances, passages, courts, vestibules, stairways, corridors and hallways will only be used to enter or leave the Apartment and will not be obstructed by the Residents or the Other Occupants of the Apartment.

R2.  The Residents are responsible and will pay for any damages to the Apartment or the Apartment Community, which occur because of property being moved or carried into or out of the Apartment.

R3.  The Owner may retain a passkey to the Apartment. The Residents will not alter any lock or install any doorknocker on the door to the Apartment.  The Residents may install an additional lock on the door to the apartment if the Owner consents to the lock, if the installation is done in a competent and workmanlike manner, and if the Residents give an additional key to the lock to the Owner. If it is necessary for the Owner or others to enter the Apartment because of an emergency and damage occurs in entering because of the additional lock, the Resident must pay for the damages.

R4.  No shades, screens, awnings or other projections will be attached to or extend beyond the outside walls, windows or doors of the Apartment without the Owner's consent.

R5.  No sign, advertisement, notice or other lettering will be placed anywhere in the Apartment Community which can be seen from outside of the Apartment.

R6.  No spikes, hooks or nails will be driven into the walls or woodwork of the Apartment; except that a reasonable number of paintings or pictures may be hung in the Apartment using only small wire nails.  No mirrors, cork, picture hangers or wall decor will ever be glued to the walls. In any case the Resident will be responsible for restoring the walls.

R7.  No telephone will be installed on any wall of the Apartment.

R8.  Kitchen appliances, sinks, toilets and other equipment should only be used in the manner for which they were designed.  Ice should not be removed from refrigerators with tools or instruments.  Hot pots, cigarettes or other hot items should not be placed directly on kitchen counters.  Cutting should be done on a cutting board, and not on kitchen counters.

R9.  Sinks and toilets should not be used to dispose of grease, rubbish, sweepings, cigarettes, cigars, paint, disposable diapers or sanitary napkins.  Instead, these types of waste should be disposed of in proper receptacles.

R10.  The Residents will not allow anything to fall or be thrown or swept form the windows, doors or balconies of the Apartment into hallways, ground areas or other places outside the Apartment.

R11.  The Residents, the Other Occupants, and their guests and visitors will not do anything in the Apartment Community which will interfere with the rights, comforts or convenience of other Residents.  No musical instruments, radios, televisions, or other devices will be used in a manner that disturbs or annoys other Residents, nor will any disturbing noises be made at any time.

R12.  Children will be properly supervised by their parents at all times.  Children will only be allowed to play in areas provided for them, and will not be permitted to play on the stairways, hallways, basements or other similar areas.

R13.  Laundry work will only be done in designated laundry rooms; and washing machines and dryers will only be used in designated laundry rooms.

R14.  Newspapers, cans and other garbage should be placed only in the Owner's containers, if provided by the Owner, or in proper containers of the Residents if not provided by the Owner. Container lids will be kept tightly closed at all times and the Residents will comply with all governmental regulations relating to the containers and their use.

R15.  The storage of kerosene, gasoline or other flammable or explosive materials in the Apartment Community is prohibited.

R16.  Any storage areas designated for the Residents use will be used in a safe manner and no electrical appliances will be connected to any light sockets in the storage areas.

R17. No Hibachi, grill, barbeque or similar device used for heating or cooking shall be allowed or stored on or under any balcony or overhanging portion of any building or within ten (10) feet of any building.

R18. No personal property of any kind will be placed or kept on the lawns.

R19. Trees and shrubbery are a vital and valuable part of the Apartment Community and the Residents understand they will be responsible for any damage, which is caused by the Residents, the Other Occupants of the Apartment or their guests or visitors.

R20. The parking or storage of automobiles not used on a regular basis, campers, snowmobiles, trucks, commercial vehicles, recreational vehicles, and motorcycles within the Community is strictly prohibited. Permitted automobiles and other vehicles will be driven only on the roadways and parked only in proper parking areas; and no repairing or washing will be done at any time in the Apartment Community. Motorcycles and any other vehicles disturbing to other Residents are expressly prohibited and will not be brought into the Apartment Community; and the Residents will be responsible for any towing or removal costs. The Owner will be the final judge of whether any vehicle is disturbing.

R21. A service charge will be levied on all lockouts after hours or on holidays in the amount of $50.00. Your manager will only be permitted to open your unit for you after you sign a form acknowledging your agreement to pay the service charge and after providing sufficient identification.

R22. The Owner may establish separate rules and regulations governing the use of the swimming pool, recreation areas, and other Common Areas in the Apartment Community. Such separate rules and regulations will be available at the manager's office of the Apartment Community, or may be posted at the separate areas. The Residents are responsible for reading the rules and for abiding by them as well as having all Other Occupants and guests and visitors abide by them.

R23. The Residents have identified all occupants that will be living in the Leased Premises. In the event that there are more occupants living in the Leased Premises then represented in the Lease Agreement, the Owner may charge the Residents one hundred ($100.00) dollars per day for each additional occupant and exercise any and all other remedies for default.

R24. These rules and regulations may be changed or additional rules and regulation added by the Owner as permitted in the Lease.

In accordance with Ohio Law we wish to inform you that the name and address of the Owner of Hidden Creek Apartments is:

AndMark Hidden Creek Apartments, LLC
31731 Northwestern Hwy #250
Farmington Hills, MI 48334
Telephone  248-855-5400

IN WITNESS WHEREOF, the parties hereto have signed the Lease Agreement on the day, month and year stated at the beginning of this Lease Agreement.

**I acknowledge receiving all 9 pages of this Lease Agreement.**

Signature of Resident

12/11/2020
Dated

Signature of Resident

Dated

Signature of Resident

Dated

AndMark_000149

_____          _____
Signature of Resident                                           Dated

_____          _____
Signature of Guarantor                                        Dated

_____          _____
Signature of Guarantor                                        Dated

_____          _____
Signature of Guarantor                                        Dated

_____          _____
Signature of Guarantor                                        Dated

_____          12/12/2022
Authorized Signature of Owner of Agent              Dated

t0287896
Pamela                                                                    White

## Bed Bug Addendum

This addendum modifies your Lease Agreement with **Hidden Creek and Creekbend Apartments** and specifically addresses situations related to bed bugs. By signing below, you are agreeing to the following:

a. Prior to move-in or within 48 hours of move-in, you have inspected your home and notified us of any bed bug infestation.

b. You acknowledge that you are not aware of any infestation or presence of bed bugs in your current home/dwelling. Furthermore, you agree that your belongings, ie. clothing, furniture and person possessions are not infested or show presences of bed bugs.

c. You agree that if you have previously resided in a location anywhere that had a bed bug infestation, all of your personal belongings have been treated by a licensed pest control professional/company.

d. You agree to promptly notify the leasing/management office of any known or suspected bed bug activity. Prompt notification means within 24 hours of suspected or known activity.

e. You acknowledge and understand that you will be expected to grant access to your dwelling and belongings for the purpose of inspection, treatment and retreatment at management's discretion. Your full cooperation including following outlined procedures for prepping of your belongings and dwelling for inspection, treatment and retreatment is expected

f. Any treatment of your dwelling for bed bugs will be completed by a contractor of the Landlord's choosing and at no time are you the resident permitted to seek treatment from any other source

g. Any request to transfer units due to bed bug infestations will not be approved until management has been provided proof that your personal belongings and property have been treated and are free of bed bugs

h. Except for residents assisted by HUD, Management reserves the right to charge all reasonable costs for bed bug treatments back to the resident should they be identified as the source by a licensed pest control professional. Failure to pay for these costs will place you in default of your Lease Agreement and the Landlord will exercise their right to terminate your lease and proceed with collection efforts and any other remedies provided for in the Lease Agreement

i. Upon move-out, should we verify the presence of bed bugs in your dwelling, you may be responsible for all costs associated with treatment

j. Except as expressly modified above, your Lease Agreement remains in full force and effect

k. To the extent of any conflict between your Lease Agreement and this Addendum, this Addendum shall control. Notwithstanding anything to the contrary in this Addendum or the Lease Agreement, the Owner and the Landlord agree that it will not exercise any remedy or enforce any provision in this Addendum that is contrary to any applicable city, state or federal law, statute, ordinance, regulation or guideline

Resident _____ Date 12/11/20

Resident _____ Date

Resident _____ Date

Resident _____ Date

Agent for Owner _____ Date 12/12/2020

Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

**Lead Warning Statement**

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

**Lessor's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

   (i) _____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

_____

   (ii) _____ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

_____

(b) Records and reports available to the lessor (check (i) or (ii) below).

   (i) ~PW Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

   (ii) _____ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgment (initial)**

(c) ~PW Lessee has received copies of all information listed above.

(d) _____ Lessee has received the pamphlet Protect Your Family from Lead in Your Home.

**Agent's Acknowledgment (initial)**

(e) _____ Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

x Pamela White    12/11/20
Lessor            Date                Lessor             Date

Lessee            Date               Lessee             Date

Agent       12/17/2020      Date         Agent              Date